JGM:WES
F.#2010R00609

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - X

M-10-1290

IN THE MATTER OF THE SEARCH OF
ELECTRONIC MAIL USER ACCOUNTS:

greenwich4@aol.com
GeorgeSperanza@aim.com
Cavanagh555@hotmail.com
afan307@hotmail.com
davidbomart.bcllc@gmail.com

AFFIDAVIT IN SUPPORT
OF SEARCH WARRANTS

(T. 15, U.S.C., §§ 78j(b)
and 78ff; and T. 18,
U.S.C., §§ 371, 1505, and
1956(h))

- - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

Thomas McGuire, being duly sworn, deposes and says that

he is a Special Agent with the Federal Bureau of Investigation

("FBI"), duly appointed according to law and acting as such.

Upon information and belief, there is probable

cause to believe that contents of electronic communications from

January 1, 2007 to May 4, 2010, in the user accounts

greenwich4@aol.com and GeorgeSperanza@aim.com (maintained by AOL

Inc., an Internet service provider located in Dulles, Virginia);

Cavanagh555@hotmail.com and afan307@hotmail.com (maintained by

Microsoft Corporation, an Internet service provider located in

Redmond, Washington); and davidbomart.bcllc@gmail.com

(maintained by Google Inc., an Internet service provider located

in Mountain View, California)(collectively, the "EMAIL

ACCOUNTS"), contain evidence, fruits and instrumentalities of

1

violations of Title 15, United States Code, Sections 78j(b) and
78ff; and Title 18, United States Code, Sections 371, 1505, and
1956(h)).

      The source of your affiant's information and the
grounds for his belief are as follows:

<u>INTRODUCTION</u>

      1.    I have been an FBI Special Agent for over seven
years and am currently assigned to the New York Field Division,
Squad C-43, where I am tasked with investigating securities
fraud, wire fraud, and other white collar crime.  Based on my
training and experience, individuals who perpetrate securities
fraud often communicate via email to further their fraudulent
schemes.

      2.    Among other duties, I am participating in an
investigation of violations of securities fraud statutes, Title
15, United States Code, Sections 78j(b) and 78ff; an obstruction
of justice statute, Title 18, United States Code, Section 1505,
and a money laundering statute, Title 18, United States Code,
Section 1956(h), among other crimes.

      3.    Based on the facts set forth in this Affidavit, I
respectfully submit that there is probable cause to believe that
there is presently located in the EMAIL ACCOUNTS evidence and
instrumentalities of violations of Title 15, United States Code,
Sections 78j(b) and 78ff (securities fraud); Title 18, United

States Code, Section 1505 (obstruction of justice), and Title 18, United States Code, Section 1956 (money laundering), among other crimes.[1]

4.    The facts set forth in this Affidavit are based in part on information that I have learned from conversations with other agents with the FBI and other law enforcement agencies, and from my review of public records, including public filings with the Securities and Exchange Commission ("SEC"), testimony and evidence provided to the SEC, law enforcement databases, interview reports, documents obtained by subpoena, evidence seized pursuant to search warrants, and other records and evidence.  I have also conducted numerous interviews related to this investigation.

5.    Because this Affidavit is being submitted for the limited purpose of seeking search warrants, I have not set forth each and every fact learned during the course of this investigation, but simply those facts which I believe are necessary to establish probable cause to support the issuance of search warrants for the EMAIL ACCOUNTS.  Except where otherwise noted, all conversations described in this Affidavit are set forth in part and in substance only.  Similarly, all assertions

---

[1] Pursuant to Title 18, United States Code, Section 2703(f)(1), I have requested that AOL Inc., Microsoft Corporation, and Google Inc. preserve records, including stored electronic communications, relating to the EMAIL ACCOUNTS.

concerning dates, numbers, and dollar figures are approximate, based upon information and evidence gathered to date.

## COMPUTERS AND THE INTERNET

6.    Based on my knowledge, training, and experience, and the experience of other law enforcement officers, I have knowledge of the Internet and how it operates.  The Internet is a worldwide computer network which connects computers and allows communications and transfer of information and data across state and national boundaries.  Individuals who use the Internet can communicate by using, among other methods, email.  The following paragraphs describe some of the functions and features of the Internet as it relates to the subject of this search warrant.

### Electronic Mail ("email")

7.    An email is an electronic communication which usually contains written correspondence and graphic images.  It is similar to conventional paper mail (a physical communication) in that it is addressed from one individual to another and is usually considered private.

8.    An email usually contains a message "header" which generally displays the sender's email address, the recipient's email address, and the date and time of the email transmission. Email addresses on the Internet usually appear in a form which contains first a name chosen by the user followed by the name

4

associated with the Internet service provider, separated by the
"@" symbol, for example, "greenwich4@aol.com."

### Internet Service Providers

9.    Individuals who communicate by email over the
Internet do so through an Internet account, which is owned by an
Internet Service Provider ("ISP").  An ISP is an organization or
company that provides subscribers to its services access to the
Internet, as well as electronic communications services, such as
email.  AOL Inc., Microsoft Corporation, and Google Inc. (the
"EMAIL ACCOUNTS ISPs") are ISPs.

### The EMAIL ACCOUNTS ISPs

10.    Each subscriber to the services of an EMAIL
ACCOUNTS ISP uses a computer or wireless device to connect to a
central computer system operated by the EMAIL ACCOUNTS ISP.
Through email, a subscribers can send messages to other email
subscribers on the Internet (regardless of whether they are
subscribers using the same ISP) and attach files to those
messages.  These files (in computer format) may be items such as
written documents or graphic image files which are photographs
that have been scanned into the computer system.  Both types of
files can be printed out by anyone who has "downloaded" them and
who has access to a printer.

11.    Subscribers to the services of an EMAIL ACCOUNTS
ISP are able to use screen names during communications, which in

5

many cases do not provide the subscriber's true name or identifying data.  In addition, a subscriber can fill out a subscriber profile which corresponds to the subscriber's screen name.  The subscriber, however, can put any identifying information into this profile.  There is no check by an EMAIL ACCOUNTS ISP or anyone else as to the accuracy of subscriber information entered into this profile.

12.  The EMAIL ACCOUNTS ISPs maintain records pertaining to their subscribers.  These records include subscriber information, account access information, email transactional information, and other information which records the activities and interactions of these accounts.

13.  Any email that is sent to an EMAIL ACCOUNTS ISP subscriber is electronically stored in the subscriber's "mail box" on a central computer system maintained by the EMAIL ACCOUNTS ISPs until the subscriber connects to the particular EMAIL ACCOUNTS ISP's computer system and retrieves his or her messages.  After a subscriber retrieves and deletes a particular message, the message will also be deleted from the subscriber's EMAIL ACCOUNTS ISP's computer system.  If, however, a subscriber retrieves a message and does not delete it, the message will remain on the EMAIL ACCOUNTS ISP's computer system.

## PARAMETERS OF LEGAL AUTHORITY

14.   Title 18, United States Code, Chapter 121, Sections 2701 through 2712, is entitled the "Stored Communications Act" ("SCA").  Section 2703 of the SCA sets forth the procedure that federal and state law enforcement officers must follow to compel disclosure of various categories of stored records from Internet service providers.  As shown from the following provisions of Section 2703, the government may compel disclosure of all stored content and records or other information pertaining to a customer or subscriber of an electronic communication service or remote computer service pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

15.   Title 18, United States Code, Section 2703(a) provides, in part:

> A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant.  A governmental entity may require the disclosure by a provider of electronic communications services of the

7

contents of a wire or electronic
communication that has been in
electronic storage in an electronic
communications system for more than
one hundred and eighty days by the
means available under subsection
(b) of this section.

16.   Title 18, United States Code, Section 2703(b)

provides, in part:

(1) A governmental entity may
require a provider of remote
computing service to disclose the
contents of any wire or electronic
communication to which this
paragraph is made applicable by
paragraph (2) of this subsection -

(A) without required notice to the
subscriber or customer, if the
governmental entity obtains a
warrant issued under the Federal
Rules of Criminal Procedure or
equivalent State warrant . . . .

(2) Paragraph (1) is applicable
with respect to any wire or
electronic communication that is
held or maintained on that
service -

(A) on behalf of, and received by
means of electronic transmission
from (or created by means of
computer processing of
communications received by means of
electronic transmission from), a
subscriber or customer of such
remote computing service; and

(B) Solely for the purpose of
providing storage or computer
processing services to such
subscriber or customer, if the
provider is not authorized to
access the contents of any such

8

communications for purposes of
providing any services other than
storage or computer processing.

17.   The government may also obtain records
and other information pertaining to a subscriber to or customer
of an electronic communication service or remote computing
service by way of a search warrant.   18 U.S.C. § 2703(c)(1)(A).
No notice to the subscriber or customer is required.   18 U.S.C. §
2703(c)(3).

### FACTS SUPPORTING PROBABLE CAUSE

### INTRODUCTION

18.   In January 2010, the FBI, the IRS, and the United
States Attorney's Office for the Eastern District of New York
opened a joint criminal securities fraud and money laundering
investigation of Spongetech Delivery Systems, Inc.
("Spongetech").

19.   On May 5, 2010, Michael Metter and Steven
Moskowitz, two executives of Spongetech, were arrested pursuant
to an arrest warrant issued by the Honorable Ramon E. Reyes under
docket number M 10-507[2].   In addition, FBI and IRS agents
conducted searches of Metter and George Speranza's homes and the
offices of Spongetech and RM Enterprises International Ltd. ("RM

---

[2] This application seeks emails in the EMAIL ACCOUNTS until
May 4, 2010 to avoid retrieving any potentially privileged emails
sent after Metter and Moskowitz obtained counsel, and because
Spongetech essentially went out of business shortly afterward.

Enterprises")[3].  Furthermore, the SEC filed a complaint against Spongetech, RM Enterprises, Metter, Moskowitz, Speranza, and two attorneys, Joel Pensely and Jack Halperin, on that date.

20.  On August 4, 2010, a Grand Jury returned an indictment, docketed as CR 10-600, charging Michael Metter and Steven Moskowitz with securities fraud, obstruction of justice, and other crimes.  On October 8, 2010, the Grand Jury returned a superseding indictment, docketed as CR 10-600 (S-1), charging Metter, Moskowitz, George Speranza, Frank Nicolois, Thomas Cavanagh, Andrew Tepfer, and Seymour Eisenberg collectively with securities fraud, obstruction of justice, conspiracy to commit money laundering, and other crimes.

<u>RELEVANT ENTITIES AND INDIVIDUALS</u>

21.  At all relevant times, Spongetech was a Delaware corporation that maintained its principal business in New York, New York.  Spongetech designed, produced, marketed, and sold sponges and sponge-like cleaning products.  Its fiscal year ended on May 31.  Spongetech was a publicly traded "penny stock" company that, up until early October 2009, was traded on the Over the Counter Bulletin Board ("OTCCB")[4].  At all relevant times,

---

[3] See paragraphs 22 and 25 below relating to RM Enterprises and Speranza.

[4] The SEC suspended trading of Spongetech on or about October 5, 2009.  The suspension expired on or about October 16,

however, a significant percentage of voting stock was owned or controlled by Michael Metter and Steven Moskowitz, allowing them to control Spongetech.[5]

22.   At all relevant times, RM Enterprises was a Delaware corporation that maintained its principal offices in New York, New York.   RM Enterprises had three shareholders: Metter, Moskowitz, and Frank Lazauskas.

23.   At all relevant times, Michael Metter was Spongetech's Chief Executive Officer and President.   According to his sworn testimony before the SEC in October 2009, Metter oversaw the marketing and sales of Spongetech and, at least since about Spring 2009, was present at Spongetech's office every work day, on a full-time basis.   From June 2001 through September 2007, he also served as President of RM Enterprises.   Metter resided in Greenwich, Connecticut.

24.   At all relevant times, Steven Y. Moskowitz was the Chief Financial Officer of Spongetech.   Moskowitz also served as Chief Financial Officer of RM Enterprises.

---

at which time the stock began trading only in the grey market. The "grey market" is a market that contains securities that are not listed on any stock exchange, the OTCBB, or the so-called "pink sheets."

[5] For example, according to Spongetech's SEC Form 10-KSB for the year ended May 31, 2008, Metter and Moskowitz controlled more than 50% of Spongetech's voting stock.   RM Enterprises, Metter, Moskowitz, and another individual, Frank Lazauskas, collectively owned 54% of Spongetech's common stock and 85% of Spongetech's voting stock.

25.   George Speranza operated No Hype Media, Inc., a marketing and web design company, and operated, until August 2009, nohypenobull.com, a stock promotion website, which has at times prominently provided information about Spongetech, including some of Spongetech's press releases.

26.   Thomas Cavanagh was an employee of Spongetech who traveled extensively to Europe to meet with buyers of Spongetech shares.  Cavanagh received a commission for any sales of Spongetech stock that he facilitated.

27.   Frank Nicolois was an employee of Spongetech and the long-term business partner of Cavanagh.  Nicolois also traveled extensively to Europe to meet with buyers of Spongetech shares.  Nicolois also received a commission for any sales of Spongetech stock that he facilitated.

28.   David Bomart was a fictitious attorney who supposedly had an office adjacent to Spongetech's office. Bomart's fictitious identity appeared on legal opinion letters that served to unrestrict Spongetech stock through the issuance of fraudulent opinion letters.

29.   Seymour Eisenberg was employed by Spongetech and worked in domestic sales.  Eisenberg was also the president of Asset Management Enterprises Inc. ("Asset Management"), which was incorporated in August 2008 and located at the same address as RM Enterprises.

12

30.  Andrew Tepfer was employed by Spongetech and held
the title of Vice President of Sales.  In addition, an internal
Spongetech organizational chart identified Tepfer as "executive
support."  TPEFER was also the president of Wesley Equities, Inc.
("Wesley Equities"), incorporated in December 2007, and AIT
Capital Inc. ("AIT Capital"), incorporated in August 2008.  The
addresses for both companies were the same as the address for RM
Enterprises.

<u>THE FRAUDULENT SCHEME</u>

31.  From approximately January 2007 to May 2010,
Michael Metter and Steven Moskowitz, along with others, executed
a scheme to (a) publicly report false and materially overstated
sales figures to create artificial demand, and increase the share
price and trading volume of, Spongetech common stock; (b) issue
restricted Spongetech common stock to entities controlled by
Spongetech; (c) unrestrict the stock; (d) sell the unrestricted
stock to domestic and foreign investors; and (e) personally
profit from the stock sales.

32.  Specifically, Michael Metter and Steven Moskowitz
publicly reported that Spongetech had secured purchase orders
from and had made sales to the following five customers:
SA Trading Company, US Asia Trading, Dubai Export Import Company,
New Century Media, and Fesco Sales Corp.  In some instances,
Spongetech reported that sales to these five customers

13

constituted as much as approximately 99% of Spongetech's reported revenue.  The five customers, however, did not in fact exist and therefore no such purchase orders could have been secured and no such sales could have been made.

<u>SPONGETECH'S FALSE SEC FILINGS AND<br>FRAUDULENT PRESS RELEASES</u>

33.  Michael Metter and Steven Moskowitz filed or caused to be filed multiple reports with the SEC that disclosed to existing and potential investors false and grossly overstated sales figures.  During that same period of time, Metter and Moskowitz issued or caused to be issued numerous press releases — typically via the Internet — that disclosed to existing and potential investors false and grossly overstated sales figures, as well as phony purchase orders and other false information. Set forth below are several SEC filings and some of the press releases.

<u>April 30, 2007</u>

34.  On April 30, 2007, Spongetech issued a press release announcing that it had signed a "letter of intent" to sell 1.5 million sponges to "SA Trading Group Corp.," which Spongetech described as "an exporter of automotive products in South America."  The press release also quoted Steven Moskowitz: "This is an exciting time for [Spongetech].  We look forward to finalizing our agreement with SA Trading Group Corp (sic) and beginning our sales and distribution into South America."

14

35.  On April 30, 2007, the volume of trading in Spongetech stock increased from 376,790 shares the prior day to 1,688,731, and the stock price rose from $0.17 to $0.23, a 35% increase.

May 9, 2007

36.  About one week later, on May 9, 2007, Spongetech issued a press release announcing that it had signed an agreement with SA Trading Group Corp., and that the agreement "starts with an order of $1,500,000" of product that would be delivered between September 15 and October 10, 2007.  This press release also quoted Steven Moskowitz touting the purchase order.

37.  On May 9, 2007, the volume of trading in Spongetech stock increased from 58,300 shares the prior day to 1,343,977, and the stock price rose from $0.15 to $0.22, a 47% increase.

May 15, 2007

38.  About one week later, on May 15, 2007, Spongetech issued a press release announcing that it had received a second purchase order from SA Trading Group Corp., and that the order was for 500,000 units representing $3,000,000 in sales.  Steven Moskowitz commented in the press release as follows: "I am really pleased with this second order and the way [Spongetech] is starting to roll with sponge technology and the new products we

are working on.  We hope to have one or two new Spongetech products ready in the next few weeks."

### August 21, 2007

39.  On August 21, 2007, Spongetech issued a press release announcing that it had received a third purchase order from SA Trading Group Corp., and that the order was for 375,000 units, representing $3,755,000 in sales.  Again, Steven Moskowitz was quoted, trumpeting the purchase order and corresponding sales.

### December 20, 2007

40.  On December 20, 2007, Spongetech issued a press release announcing that it had received another purchase order from "SA Trading Company" (not "SA Trading Group Corp.").  The press release indicated that the order was for $2.5 million of product, and that Spongetech would be fulfilling the order during the first quarter of 2008.  Steven Moskowitz was quoted as saying that "[t]his reorder is a good sign that there exists significant room for expansion and growth in the South America aftermarket parts industry."

41.  The December 20, 2007 press release also described a conversation that Steven Moskowitz allegedly had with "Anthony Gonzales" (identified in the press release as the President of SA Trading Company), and included positive comments purportedly made by Gonzales about Spongetech.

January 31, 2008

42.   One month later, on January 31, 2008, Spongetech issued a press release announcing that "SA Trading LCC" (not "SA Trading Group Corp." or "SA Trading Company") had placed an order for a new Spongetech pet care product known as Pet Sponge. The press release included a lengthy quote from Steven Moskowitz that ended with the following statement: "We already have one sizeable Pet Sponge product order on the books and we will be ramping up production for this product in the very near future. With support from companies like SA Trading, we should add significant new incremental revenues for [Spongetech] in 2008 and beyond."

February 29, 2008 (SEC Form 10-QSB)[6]

43.   In its SEC filing for its third quarter ended February 29, 2008, Spongetech reported nine-month sales of approximately $1.6 million, more than 28 times the amount of sales generated during Spongetech's entire preceding fiscal year.[7]   Spongetech claimed that the increase in sales was attributable to its "improved marketing campaign, including sales from [Spongetech's] website."

--------

[6] Spongetech's February 29, 2008 SEC Form 10-QSB was filed on April 15, 2008.

[7] For the year ended May 31, 2007, Spongetech reported annual sales of only $55,112.

17

44.  Both Michael Metter and Steven Moskowitz signed the SEC filing for the quarter ended February 29, 2008.  In addition, Metter and Moskowitz, as Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively, certified pursuant to 18 U.S.C. § 1350 that the information contained in the SEC filing fairly presented, in all material respects, Spongetech's financial condition and result of operations.

March 4, 2008

45.  On March 4, 2008, Spongetech issued a press release announcing a $2,750,000 re-order from "U.S. Asia Distribution Company, Inc." (not "US Asia Trading").  The press release reported that delivery of an initial order, for 10,000 units, was made in December 2007, and that those units sold out in 25 days.  Spongetech announced that the $2,750,000 re-order was for 250,000 units, which would be delivered between August and December 2008.

46.  The March 4, 2008 press release also identified "Tom Chang" as the Chief Executive Officer of U.S. Asia Distribution Company, Inc.  The press release reported that Chang said "there was great acceptance and enthusiasm of the Spongetech Auto Care Products" and that Chang "expects the same enthusiasm as they begin selling the products on TV in Australia."

47.   The March 4, 2008 press release also quoted Steven Moskowitz: "We are pleased with this re-order as we continue to expand and grow [Spongetech].   We are also in the process of testing the SpongeTech Pet Sponge and Puddle Pals in Asia and hope to see the same acceptance and enthusiasm with these products as well."

May 31, 2008 (SEC Form 10-KSB)[8]

48.   In its SEC filing for the year ended May 31, 2008, Spongetech reported annual sales of approximately $5.6 million, which included the $1.6 million referenced in its February 29, 2008 filing.   The $5.6 million represented more than 100 times the amount of sales generated during the preceding fiscal year. Spongetech again claimed that the increase in sales was attributable to its "improved marketing campaign" and website sales.

49.   Spongetech also explained in its SEC filing for the year ended May 31, 2008 that prior to that fiscal year, Spongetech "had historically depended on one customer [TurtleWax] for almost all of [Spongetech's] sales," and that it had now made significant sales to additional customers: "During the fiscal year ended May 31, 2008, three customers [accounted] for an aggregate of approximately 70.5% of sales.   [Spongetech's] three

_____

[8] Spongetech's May 31, 2008 SEC Form 10-KSB was filed on August 29, 2008.

largest customers during the fiscal year ended May 31, 2008 are SA Trading Company, US Asia Trading, and Dubai Export Import Company."[9]

50.   Both Michael Metter and Steven Moskowitz signed the SEC filing for the year ended May 31, 2008.  In addition, Metter and Moskowitz, as CEO and CFO, respectively, certified pursuant to 18 U.S.C. § 1350 that the information contained in the SEC filing fairly presented, in all material respects, Spongetech's financial condition and result of operations.

Other SEC Filings

51.   Since filing its SEC Form 10-KSB for the year ended May 31, 2008, Spongetech filed only three other quarterly or annual reports with the SEC: Forms 10-QSB for the quarters ended August 31, 2008, November 30, 2008, and February 28, 2009.[10]  In each of these SEC filings, Spongetech reported significant sales from one or more of the five non-existent customers identified above and — with respect to the third quarter ended February 28, 2009 — from sales to Walgreens:

───────────────

[9] As will become evident, the five purported customers are frequently referred to by Spongetech as having slightly varying names. For example, US Asia Trading is often referred to by Spongetech and others as "United Asia Trading."

[10] As a company whose stock is registered with the SEC, Spongetech is required to, among other things, timely file quarterly and annual reports with the SEC.  Spongetech has not filed its Form 10-KSB for the year ended May 31, 2009, nor has it filed its Forms 10-QSB for the first three quarters of its current fiscal year.

| Quarter Ended | Customers | Cumulative Sales (approx.) | Percentage of All Sales |
|---|---|---|---|
| 8/31/08 | SA Trading Company<br>US Asia Trading<br>Dubai Export Import Company | $5.5 million | 67.6% |
| 11/30/08 | SA Trading Company<br>Dubai Export Import Company<br>New Century Media | $17.9 million | 82.9% |
| 2/28/09 | SA Trading Company<br>US Asia Trading<br>Dubai Export Import Company<br>New Century Media<br>Fesco Sales Corp.<br>Walgreens[11] | $31.0 million | 99.4% |

52.  Both Michael Metter and Steven Moskowitz signed the SEC filings for the quarters ended August 31, 2008, November 30, 2008, and February 28, 2009.  In addition, Metter and Moskowitz, as CEO and CFO, respectively, certified pursuant to 18 U.S.C. § 1350 that the information contained in the SEC filings fairly presented, in all material respects, Spongetech's financial condition and the results of operations.[12]

---

[11] In October 2009, Walgreens reported that since the inception of its relationship with Spongetech, it had received Spongetech sales invoices totaling only approximately $195,000, and paid Spongetech only approximately $10,000.

[12] On or about January 9, 2009, Michael Metter appeared on "MoneyTV" for an interview with Donald Baillargeon.  A videotape of the interview is publicly available on the Internet at www.youtube.com/watch?v=R-20sZoZLlI.  During the interview, Metter stated, among other things, that "we think that for the year that ends May 31st, 2009, that we are going to make around $7 million on $40 million in sales."  After Mr. Baillargeon commented that such figures were "incredible," Metter discussed,

21

Other Press Releases

53.  On September 1, 2009, Spongetech issued a press release announcing that it had "booked" approximately $70 million in orders during the quarter ended August 31, 2009.  The press release quoted Steven Moskowitz as saying, among other things: "We believe that we will continue to see strong growth within [Spongetech] going into the holiday season.  Our brand marketing strategy has been successful thus far and we believe we are positioning [Spongetech] to become the next household brand name."

54.  The September 1, 2009 press release also quoted Michael Metter discussing Spongetech's failure to file its SEC Form 10-KSB for the preceding fiscal year: "We are in the process of finalizing our Annual Report for the fiscal year ending May 31, 2009 and expect to file the Form 10-K with the SEC shortly. We remain focused and committed to building [Spongetech] into a globally recognized Company and continue to work towards building shareholder value."  To date, no such SEC filing has been made.

THE FIVE PURPORTED CUSTOMERS DO NOT EXIST

55.  The investigation has revealed that the five Spongetech customers discussed above — SA Trading Company, US

---

in detail, the nature of some of Spongetech's products, some of which Metter claimed Spongetech was "shipping [to] all over the world."

Asia Trading, Dubai Export Import Company, New Century Media, and
Fesco Sales Corp. — do not exist and, accordingly, that the sales 
purportedly made to those customers by Spongetech could never
have occurred.

I.   The Failed Attempts to Establish the Existence of
     the Five Purported Customers

     56.  Beginning on or about September 4, 2009, the
Enforcement Division of the SEC issued subpoenas to various
entities and individuals, including Michael Metter, Steven
Moskowitz, and George Speranza, as part of a formal investigation
of Spongetech that was approved by the Commission itself.  At or
about the time of the commencement of the investigation, the SEC
provided Spongetech with a copy of the formal order of
investigation.  Since then, Metter and Moskowitz, with the help
of others, have corruptly attempted to fabricate the existence of
the five purported customers.  Specifically, Metter and Moskowitz
have (1) sought to create Internet websites and virtual offices
for the customers; (2) furnished phony purchase orders
purportedly issued by the customers; and (3) produced false
documentation purportedly constituting proof of payments by the
customers.

     A.   Websites and Offices

     57.  In or about September 2009, Spongetech provided
the SEC with United States addresses for the five purported
customers.  The SEC used this information to issue subpoenas to

the customers to, among other things, verify their existence. After those subpoenas were served, the landlords of the addresses that Spongetech provided for SA Trading Company and US Asia Trading informed the SEC that the landlords had no records pertaining to such entities.  The SEC did receive a response from New Century Media, but New Century Media indicated that it was in the business of replicating CDs and DVDs, and that it had no dealings with Spongetech.

58.  In or about November 2009, the SEC subpoenaed documents from Domains by Proxy, a company that offers private domain name registrations for Internet websites.[13]  Domains by Proxy provided records showing that domain names for the five customers — SATradingCompany.com, UnitedAsiaTrading.com, DubaiExportImportCo.com, FescoCorp.com, and NewCenturyMediaCo.com — were all registered on the same date (September 10, 2009) and that they were registered only six days after the SEC served subpoenas on Spongetech, Michael Metter, and Steven Moskowitz.

59.  The five domain names identified above were registered by George Speranza.  As part of his marketing business, George Speranza designed, created, and published Internet websites.

_____

[13] "Private domain name registrations" do not publicly reveal the registrant's name and contact information.

60.   In response to an SEC subpoena, George Speranza wrote an October 23, 2009 letter to the SEC, explaining how he came to create websites for the five customers:

> In February or March 2009, I was requested to design a website for each of [the five customers] by a man named Richard Heller, who I did not know.  I have no idea whether he has any connection with Spongetech and have not spoken with him since last summer.  After registering and designing each of the sites, and obtaining phone numbers for each of the companies, I was not paid at all by the companies or anyone else. . . .  I am not involved whatsoever with the companies, don't know what they do and have no continuing contact with them.

61.   One week later, on October 30, 2009, George Speranza provided sworn testimony to the SEC.  Speranza explained that he met Heller in February or March 2009 in the elevator of the building in which Spongetech's offices were located. Speranza was visiting Spongetech at the time to solicit marketing work.  According to Speranza, Heller overheard Speranza discussing Speranza's ability to create websites.  Heller allegedly told Speranza about five overseas companies that, according to Heller, did not have a presence on the Internet and were having trouble handling a large number of incoming phone calls.  Speranza further testified that Heller then hired Speranza to create websites for those companies.  As he did in his October 23, 2009 letter, Speranza denied during his SEC testimony that he knew in February or March 2009 that Heller had

any connection to Spongetech.  Speranza also testified that after
his elevator meeting with Heller, he had no contact with Heller —
or with Spongetech — about the websites, and that although Heller
promised to pay $1,000 for each website, Speranza was never
actually paid for his website work.[14]

62.  Records produced in response to SEC subpoenas
confirm that Speranza did not actually register the domain names
until six months later — on September 10, 2009 — and, as noted
previously, only six days after the SEC served subpoenas on
Spongetech, Michael Metter, and Steven Moskowitz.

63.  On September 28, 2009 — one month before George
Speranza's SEC testimony — an individual sent an email to Steven
Moskowitz.  In the email, the individual referenced
www.duabiexportimportco.com/catalogue.htm, and asked whether
Moskowitz believed the website page to be "fake."  The individual
also wrote in the email that the individual was "hoping it is not
your [web]site or set up by [S]pongetech."  Soon after receiving
the individual's email, Moskowitz forwarded it to Speranza and
wrote only "See e mail (sic) below."  Speranza replied, "What
does all of this mean?"  Moskowitz then asked Speranza, "[w]ho's
(sic) [web]site is that below."  In response, Speranza stated

---

[14] Heller founded RM Enterprises.  He died in May 2009, a
few months after his purported elevator meeting with Speranza.

26

"[t]hat is the [web]site . . . its (sic) a link to products."
Moskowitz later wrote that the website "[l]ooks nice."

64. On or about September 16, 2009, Steven Moskowitz
wrote a $5,000 check from RM Enterprises to George Speranza which
Speranza later cashed.

65. On June 8, 2010, your affiant interviewed George
Speranza. Speranza admitted that his testimony to the SEC about
meeting Heller in the elevator where they purportedly discussed
creating websites was not true, and that he had never met Heller.

66. George Speranza also created virtual offices for
the five companies.[15] Documents obtained from DaVinci Virtual
Office Solutions ("DaVinci") reveal that on or about September
22-23, 2009, Speranza arranged for virtual offices to be created
by DaVinci in the following United States cities:

| Customer | Virtual Office Location |
|---|---|
| SA Trading Company | Miami, FL |
| US Asia Trading | Los Angeles, CA |
| Dubai Export Import Company | Atlanta, GA |
| New Century Media | Bridgewater, NJ |
| Fesco Sales Corp. | New York, NY |

---

[15] A "virtual" office is a combination of off-site live
communication and address services that often allow users to
reduce traditional office costs while maintaining business
professionalism.

67.  Documents obtained from Regus, another virtual office provider, reveal that on or about and between September 24 and 28, 2009, George Speranza arranged for virtual offices to be created by Regus in the following United States cities, and Speranza provided the following contact names:[16]

| Customer | Virtual Office Location | Contact Name |
|---|---|---|
| SA Trading Company | Miami, FL | Carlos Vega |
| US Asia Trading | Dallas, TX | Steven Chin |
| Dubai Export Import Company | Boston, MA | Ahmed Elsayed |
| New Century Media | Paramus, NJ | Helen Simms |
| Fesco Sales Corp. | New York, NY | Jim Rogers |

68.  Early in the morning on September 28, 2009, Michael Metter sent an email[17] to George Speranza with the subject line "phone calls and numbers needed." After beginning the email with Speranza's first name, Metter wrote as follows:

---

[16] In April 2010, the FBI performed public records checks for the five purported customers, searching for such entities within the states identified by Spongetech. The searches yielded no positive results. (Virtual offices are not detected in such databases.) During Speranza's SEC testimony, he admitted that most, if not all, of the virtual office contact names he provided to Regus were fictitious.

[17] The email was sent from greenwich4@aol.com (discussed in paragraph 119 et seq. below) to GeorgeSperanza@aim.com (discussed in paragraph 121 et seq. below).

It is very important that you contact me with
the numbers that Steve said you were going to
supply for the regulators.  Also the
phonenumber (sic) Barry gave me is not going
through as I tried to call you first.  The
two or three numbers are needed since I can't
reach Steven today because of the holiday.

Based on the context of the email, your affiant believes that

"Steve" or "Steven" is Steven Moskowitz, and "Barry" is Barry

Kolvezon, the Spongetech Chief Operating Officer ("COO").

Subsequent email correspondence indicates that Metter was

requesting the information from Speranza so Metter could give it

to the SEC, which Metter later did.

B.   Purchase Orders

69.  In or about late 2009, Spongetech furnished —

pursuant to an SEC subpoena — numerous purchase orders

purportedly issued to Spongetech by SA Trading Company, US Asia

Trading, Dubai Export Import Company, New Century Media, and

Fesco Sales Corp.[18]  An examination of these purchase orders,

however, reveals that they contain common characteristics that

strongly suggest that they are fake and that they were created by

the same person(s).  For example:

---

[18] Despite reporting significant sales in 2009 to Dubai
Export Import Company and Fesco Sales, Spongetech produced only
two Fesco Sales purchase orders for that year (totaling
$2.85 million).  Spongetech did not produce any Dubai Export
Import Company purchase orders for 2009.

70.  *Capitalization of first words of addresses*.
Purchase orders from all five of the purported customers have
errors relating to the capitalization of the first word in the
customer's own address.  For example, numerous US Asia Trading
purchase orders have a letterhead address of "port of Elizabeth"
in Elizabeth, New Jersey.  Similarly, numerous SA Trading Company
purchase orders have a letterhead address of "port of Miami" in
Miami, Florida.

71.  *Street addresses*.  The purchase orders for
SA Trading Company and US Asia Trading, as well as one purchase
order from Dubai Export Import Company and one from New Century
Media, fail to provide a street address for the purported
customers.  Instead, they list only a shipping address located at
a domestic sea port or airport, such as "port of miami dock 37,"
"port of Elizabeth," "Airport Freight Terminal," or "port of
Elizabeth."

72.  *ZIP Codes*.  Purchase orders from all five of the
purported customers have incorrect or nonexistent ZIP Codes in
the customer's own address.  For example, certain SA Trading
Company purchase orders indicate that its ZIP Code in Miami,
Florida is 84765.  That ZIP Code, however, is for Santa Clara,
Utah.  Similarly, many of the US Asia Trading purchase orders
indicate that its ZIP Code in Elizabeth, New Jersey is 08473, as
does at least one New Century Media purchase order.  But the

United States Postal Service online database contains no entry
for ZIP Code 08473.[19]

73.  *Contact persons*.  Some purchase orders contain
names and signatures of individuals who, according to George
Speranza's sworn SEC testimony, are fictitious.  For example, a
Fesco Sales purchase order contains a "Jim Rogers" signature.
Similarly, numerous purchase orders list "Steven Chen" (not
"Steven Chin") as a contact person.  As noted previously,
Speranza has admitted under oath that these contact persons are
fictitious.[20]

74.  *Purchase order numbers*.  Some of the five
purported customer purchase orders have the same purchase order
number, even though the orders span long periods of time and
appear to be separate.  For example, 20 US Asia Trading purchase
orders that span a period from November 2007 through January 2009
have the same purchase order number (#5252007).  Similarly, 17
SA Trading Company purchase orders that span a period from

---

[19] Elizabeth has ZIP Codes 07201 through 07208, and Port
Elizabeth is located in ZIP Code 08348.

[20] Despite the fact that Speranza has admitted under oath
that most, if not all, of the contact names are fictitious,
Michael Metter and Steven Moskowitz claimed during their SEC
testimony that they had met and spoken with one or more of these
"persons."  For example, Metter testified that he actually met
Ahmed Elsayed (Dubai Export Import Company), and that the meeting
occurred at an automobile trade show.  Indeed, Moskowitz
testified that he had recently spoke with Carlos Vega (SA Trading
Company), Steven Chin (US Asia Trading), and Mr. Elsayed.

April 2007 to March 2009 have the same purchase order number (#4272007).

C.   Proof of Payment

75.   In testimony before the SEC, Michael Metter and Steven Moskowitz maintained that the sales to the five purported customers were real, and that the customers had actually paid Spongetech for the sales.   In or about January 2010, Spongetech furnished bank records purporting to represent wire transfer payments received from the five customers.   An examination of these bank records, however, reveals that they contain certain information that strongly suggest that they do not constitute valid proof of payment by the customers to Spongetech for its products.   For example:

76.   *RM Enterprises*.   The bank records relate to an RM Enterprises bank account, and not to Spongetech, and there is no evidence that the five purported customers paid Spongetech through RM Enterprises.   (Indeed, none of purchase orders furnished by Spongetech mentions RM Enterprises.)

77.   *Payer names*.   None of payments was made by an entity containing the name of one of the five purported customers.   In fact, at least eight of the payments appear to have been made by individuals.   Furthermore, many of these purported payments were made from accounts in foreign countries, including Hungary, Panama, Switzerland, and the Bahamas.

32

78.   *Stated payment purposes*.   Some of the payments contain references to purposes other than sales.   For example, two wire transfers contain a note stating "investment share purchase."[21]

79.   *Cumulative amount of payments*.   The total amount of the payments for which Spongetech attempted to provide proof is only approximately $4 million.[22]   As noted previously, Spongetech claimed in its SEC Form 10-QSB for the quarter ended February 28, 2009, that it sales of approximately $31 million, approximately 99% of which Spongetech claimed was from the five purported customers.

## II.   Evidence Obtained from Search Warrants

80.   On May 5, 2010, the FBI and the IRS executed a search warrant on the offices of Spongetech and seized thousands of documents.   While the search identified numerous documents in hard copy created by Spongetech referring to SA Trading, United Asia, Dubai Export, Fesco Sales, and New Century, no letters, purchase orders, or other documents (in hard copy[23]) were located that appear to have been created by any of the companies.

---

[21] Most, if not all, of the wire transfer notes are in a foreign language.   For the purposes of this Affidavit, only a general translation was conducted.

[22] These amounts were for payments supposedly made from November 2007 through July 2009.

[23] The processing of seized electronic documents has not yet

SPONGETECH'S USE OF FRAUDULENT ATTORNEY OPINION LETTERS
TO SELL RESTRICTED SHARES OF SPONGETECH STOCK

I.   Regulatory Background

81.   Approximately 2.9 billion shares of Spongetech stock were initially issued in private transactions.  Securities laws impose significant restrictions on the sale of shares that have been issued in private transactions.  Shares acquired in a private sale bear a restrictive legend that states that the shares may not be resold in the public marketplace unless the offer and sale fall within an exception to the general requirement that securities offered for sale in the United States be registered with the SEC.

82.   One exemption is contained in SEC Staff Legal Bulletin Number 4 ("Bulletin 4"), which provides a narrow exception for shares of a subsidiary distributed to shareholders of a parent company in a spin-off.  The bulletin requires, among other things, that the shares be transferred (1) pro rata to all shareholders, (2) without consideration from the shareholders, and (3) for a valid business purpose.  Additionally, the parent must have held the shares for two years prior to the spin-off.  Another exemption is contained in Title 17 of the Code of Federal Regulations, Section 230.144 ("Rule 144").  Rule 144 requires, among other things, that the issuer comply with periodic SEC

been completed.

reporting requirements and that any affiliate sell no more than 1% of all outstanding shares over any three-month period. Additionally, the shares must satisfy a six-month holding period before the restrictive legend can be removed.

83.   Even if all conditions of Bulletin 4, Rule 144, or any other applicable exemption/exception or safe harbor are met, restricted shares cannot be sold to the public until the restrictive legend has been removed from the certificate.   Only a transfer agent can remove the restrictive legend.[24]   In general, a transfer agent will not remove a restrictive legend unless the issuer consents.   Transfer agents hired by Spongetech required an opinion letter from an attorney confirming a valid exemption from the registration requirement prior to removing a restrictive legend.

II.   Investigation of Opinion Letters

84.   This investigation has identified evidence that established that most of the opinion letters that were purportedly provided to Spongetech from early 2007 to late 2009 were false, forged, materially misleading, or otherwise fraudulent.   Approximately 200 opinion letters were sent to Spongetech's transfer agents.   Collectively, these letters were

---

[24] A transfer agent is a company appointed by a firm to transfer that firm's securities.   The transfer agent typically will keep a record of the owners of the firm's securities.

used to unrestrict about 2.9 billion Spongetech shares, most of which were ultimately sold in the public marketplace.

A.   Pensley Opinion Letters

85.   In early 2007, Joel Pensley, a New York attorney, drafted four opinion letters relying on Bulletin 4.  Spongetech forwarded these opinion letters to its transfer agent at the time, Olde Monmouth Stock Transfer Co., Inc. ("Monmouth").  Monmouth unrestricted about 6.9 million shares based on these Pensley letters.  Between early 2007 and May 2009, Monmouth received about 100 additional letters purportedly signed by Pensley.  Monmouth unrestricted more than one billion shares based on these letters.

86.   In May 2009, Monmouth noted some discrepancies in a March 2009 opinion letter purportedly written by Pensley.  Monmouth's attorney, Richard Fox, contacted Pensley, who told Fox that he had not written any opinion letters for Spongetech since 2007.  On May 14, 2009, Fox provided this information to the SEC by letter.

87.   On May 15, 2009, a day after Fox sent his letter to the SEC, Pensley sent a letter to the SEC.  Pensley stated that he had not written any Spongetech opinion letters since early 2007.  Pensley wrote in his letter that he had learned that "as many as one hundred opinion letters for various shareholders were issued by Spongetech under [Pensley's] name and that the

36

opinion letters were mailed to the transfer agent directly by Spongetech" without his knowledge or consent.

88.   In October 2009, Fox provided sworn testimony to the SEC.  During that testimony, Fox stated that on May 14, 2009, he called Steven Moskowitz and identified himself and why he was calling.  Fox testified that "Moskowitz indicated to me that he had permission or instructions from Mr. Pensley to simply utilize the original opinion letter and keep sending them."  Fox told Moskowitz that Pensley denied that Pensley had written the opinion letters.  Moskowitz "insisted again that that was correct in the sense that [Pensley] wasn't writing new letters, but that Mr. Pensley had told them to just simply, if you will, mimeograph them."  Moskowitz told Fox that Spongetech had emails from Pensley in which Pensley authorized Spongetech to issue the opinion letters.

89.   In November 2009, Pensley provided sworn testimony to the SEC and stated he never — implicitly or explicitly — authorized Steven Moskowitz or anyone else to use opinion letters in Pensely's name that Pensley had not actually seen or signed.

B.   Bomart Opinion Letters

90.   In May 2009, after Monmouth advised Spongetech it would no longer honor the Pensley letters, Monmouth received nine opinion letters purportedly drafted by an attorney named "David Bomart" of the firm "Bomart, Cone & Rolland LLP."  Your affiant

37

has uncovered no evidence that David Bomart exists.  Between May 14 and 21, 2009, Monmouth unrestricted about 114 million shares based on these Bomart letters.

91.  According to Fox, in May 2009 Monmouth received an email purportedly from Bomart, who stated that he would be writing opinion letters for Spongetech and that he would also be reviewing all of the Pensley opinion letters.  Monmouth received two opinion letters supposedly signed by Bomart.  The opinion letters appear to be a copy of Pensley's letter superimposed on new letterhead.  The Bomart letters do not contain a telephone number for Bomart's firm but do contain the fax number of Spongetech.  After Fox received the Bomart letters, he searched the Internet to confirm the existence of Bomart's firm.  Fox determined that no "David Bomart" was licensed to practice law in any of the three states listed on the letterhead.  Fox also determined that there was no "Bomart, Cone & Rolland LLP" organized or qualified to do business in any of those three states.

92.  My review of public databases revealed no information indicating that David Bomart is an actual person or that Bomart, Cone & Rolland LLP is an actual law firm. Specifically, I reviewed attorney bar admission websites for New York, Massachusetts, and California, and none of those sites listed an attorney named David Bomart.  In addition, I searched

38

ChoicePoint for Bomart Cone and David Bomart, and I searched
Google for Bomart Cone & Rolland and David Bomart.  I was unable
to retrieve any pertinent results from these searches.

C.   Halperin Opinion Letters

93.  In May 2009, Monmouth advised Spongetech it would
no longer honor the Bomart letters.  Spongetech then fired
Monmouth and hired a new transfer agent, Worldwide Stock
Transfer, LLC. ("Worldwide").  From May 2009 to about September
2009, Worldwide received 92 opinion letters from Jack Halperin,
another New York attorney.  Worldwide unrestricted about 922
million shares based on the Halperin letters.

94.  Many of the Halperin opinion letters relied on
loan documents signed by Asset Management, AIT Capital, and
Wesley Equities, companies owned by Spongetech employees Andrew
Tepfer and Seymour Eisenberg, to establish a beneficial holding
period of more than one year which were provided to Halperin by
Spongetech.  Many of these loan agreements were backdated.  For
example, one of the loan agreements provided to Halperin reads as
follows in its entirety (all errors in original):

> February 16, 2008
>
> Asset Management Enterprises Inc. the sum of
> 185,0000,000.00 (One Hundred and Eighty Five
> Thousand dollars) to be loaned to be used by
> Spongetech Delivery Systems Inc. the debt
> will be come 18,500,000 shares of SPNG That
> Asset Management Enterprises Inc. can
> assignee to any one or more of its
> shareholders free trading a year from now

Even though this loan agreement was dated February 16, 2008, it was not created until shortly before it was provided to Halperin in July 2009. Indeed, Asset Management, one of the parties to the purported loan agreement, was not incorporated until six months after the date on the loan agreement. Similarly, loan agreements involving AIT Capital and Wesley Equities were created shortly before they were provided to Halperin but dated more than a year earlier.

95. In his letters, Halperin relied on Rule 144 to unrestrict the shares. One of the many requirements of Rule 144 is that the issuer's financial filings with the SEC be current at the time the shares are unrestricted. In testimony to the SEC, Halperin admitted that at least some of his letters were erroneous because they supported the unrestricting of shares at a time when Spongetech was not current with its required financial filings.

D.   Holding Periods

96. Many of the attorney opinion letters represent that the relevant shares were held for the required holding period of six months (or more). A review of transfer records maintained by the transfer agents, however, reveals that the period between the issuance of the shares and the transfer of the shares was often less than the required six months.

40

SUSPICIOUS FINANCIAL TRANSACTIONS
AND ARRANGEMENTS

A.    Evidence of Structuring by Spongetech Employees

97.   The government's investigation has uncovered evidence of structuring, contrary to Title 31, United States Code, Section 5324(a)(3), by several Spongetech employees, including Thomas Cavanagh and Frank Nicolois.

98.   During the years 2008 and 2009, Thomas Cavanagh and Frank Nicolois cashed hundreds of RM Enterprises checks totaling close to $2 million.  Many of those checks were in amounts between $9,000 and $10,000.  There were no checks in excess of $10,000 that were cashed.  On two separate occasions, February 20, 2008 and March 18, 2008, Cavanagh, Nicolois, and another Spongetech employee cashed multiple checks on the same day that, when added together, would have been in excess of $10,000.  On August 10, 2009, two checks for $7,500 each were written to Nicolois.

99.   During the same time period specified above, Steven Moskowitz made at least 32 cash withdrawals from the RM Enterprises account totaling more than $190,000.  At least 13 of these withdrawals were between $8,000 and $10,000.  There were no cash withdrawals in excess of $10,000.  On two separate occasions, Moskowitz apparently broke down withdrawals of more than $10,000 into two separate withdrawals, each in amounts less than $10,000.

41

100. In or about August 2009, a representative of the bank maintaining the RM Enterprises account emailed Steven Moskowitz to inquire about the transactions discussed above. Among other things, the bank representative asked Moskowitz why the RM Enterprises checks were "always issued under the $10,000 CTR threshold." Moskowitz's initial written response was as follows: "You should make people deposit check (sic) I don't tell them to get cash you allow them to cash it and they do."

101. In response to Steven Moskowitz's initial response, the bank representative informed MOSKOWITZ that the RM Enterprises account could be closed if Moskowitz did not provide "some reasonable answer" to the representative's inquiry. Moskowitz thereafter wrote the following, specifically in response to the bank representative's question regarding the $10,000 federal reporting requirement threshold (all errors in original): "[I]f we grow we will need more then [$]10,000 at each office. We had inefficiency expert recommended along with account firm deloite we save by having the workers not wait on line get lost on the way to and from the bank."

B.   Use of Asset Management as Conduit

102. An analysis of bank and brokerage records indicates that Asset Management was used as a conduit for the sale of Spongetech shares to third parties and the subsequent receipt of money by RM Enterprises from those third parties.

42

Typically, (1) Spongetech issued restricted shares to Asset Management; (2) Asset Management, using an opinion letter, transferred unrestricted shares to third parties within days; and (3) the third party then sold the shares into the open market. In several instances, the third party later made payments to Asset Management, which Asset Management immediately forwarded to Spongetech.

103. Between August 2008 and October 2009, RM Enterprises transferred about 175 million Spongetech shares to Asset Management. For example, on June 26, 2009, Spongetech issued 22.15 million shares to Asset Management at the request of Steven Moskowitz, according to the actual stock certificate. The following business day, Asset Management transferred 22.15 million shares to a third party, and the shares were unrestricted pursuant to an opinion letter written by Halperin, who allegedly relied on loans made by Asset Management to Spongetech that Halperin claimed in his opinion letter were made "more than one year ago." In fact, however, Asset Management had not been incorporated one year earlier.

104. Nevertheless, on July 10, 2009, the third party sold the 22.15 million shares in the open market, at a time when Spongetech shares traded between $0.10 and $0.12 per share. On July 13, 2009, the third party wired $750,000 to Asset Management. The same day, Asset Management wired $825,000

43

($750,000 plus $75,000 received in an unrelated transaction) to RM Enterprises.  On July 15, 2009, the same third party wired $350,000 to Asset Management.  The next day, Asset Management wired $350,000 to RM Enterprises.  On July 24, 2009, the third party wired $672,000 to Asset Management.  The same day, Asset Management wired $672,000 to RM Enterprises.

105. The sum of the three payments referenced in the paragraph above is $1,772,000, exactly $0.08 per share for 22.15 million shares.  This indicates that the shares were not issued as repayment for a one year old loan.  Rather, this indicates that the shares were sold by Spongetech (via Asset Management) to the third party with the proceeds being received by RM Enterprises (via Asset Management) from the third party.

106. In total, Asset Management transferred more than $5.1 million to RM Enterprises, often transferring monies received from third parties immediately to RM Enterprises.

C.   Use of Other Conduits

107. Wesley Equities and AIT Capital, the two companies controlled by Andrew Tepfer, were used as conduits in a manner similar to Asset Management.

108. AIT Capital received about 175 million Spongetech shares and thereafter transferred the shares to many of the same entities to which Asset Management had transferred shares.  Most

of the monies wire and deposited into AIT Capital's bank accounts were subsequently transferred to RM Enterprises.

D.    Entities Controlled by Spouses and by Michael Metter

109. Several entities controlled by Steven Moskowitz's wife, Michael Metter's wife, and Metter himself received Spongetech shares and money from RM Enterprises.

The Steven and Mindy Moskowitz Trust

110. The Steven and Mindy Moskowitz Trust received 3.3 million shares, and in 2009, Moskowitz's wife received about $309,000 in wire transfers from RM Enterprises. Moskowitz told the SEC that he had no control over, and no beneficial interest in, the trust. According to Moskowitz, the trust was controlled by Moskowitz's wife and sister for the benefit of Moskowitz's wife and children. According to Moskowitz's SEC testimony, there was about $2 million in the trust the last time he looked at the trust's balance.

D.L. Investments, Inc.

111. D.L. Investments, Inc. ("D.L. Investments") held about 3.5 million shares of Spongetech as of September 2009. RM Enterprises wired at least $280,500 to DL Investments in 2008 and 2009. The wire transfer records list 1 Tinker Lane, Greenwich, Connecticut 06830, Michael Metter's home address, as the address for DL Investments. Metter told the SEC that DL Investments was an investment company wholly owned by his wife, occasionally

45

traded in stocks, made investments in other companies, had no employees, and operated out of an office space at Metter's home. According to Metter, his wife sold 800,000 Spongetech shares in 2007 which she had held in a DL Investments account over which Metter had no beneficial or other authority. Transfer agent records, however, show that Metter signed a notarized Corporate Resolution Certification for DL Investments on April 20, 2007, which identified Metter as the treasurer of DL Investments. Two days later, DL Investments sold 1.6 million shares of unrestricted Spongetech shares.

### Tiburon Capital Group

112. Michael Metter used Tiburon Capital Group ("Tiburon") to receive money from Spongetech and RM Enterprises. For example, Tiburon received 100,000 shares of Spongetech stock on March 16, 2007. Also, RM Enterprises wired at least $362,000 to Tiburon in 2008 and 2009. The wire transfer records list Metter's home address, 1 Tinker Lane, Greenwich, CT 06830, as Tiburon's address. A March 2004 SEC filing identified Michael Metter as "chairman of the board of Tiburon Capital Group, a privately held holding corporation." Metter told the SEC that he owned Tiburon, which made investments in other businesses, had no employees, and was operated out of Metter's home. According to Metter, Tiburon owned some part of RM Enterprises and initially received the 100,000 Spongetech shares as part of a spin-off.

113. In March 2007, Pensley, the aforementioned attorney (see paragraphs 85 et seq.), wrote an opinion letter to unrestrict shares for various beneficiaries, including the 100,000 shares for Tiburon. The Pensley letter was based on a Bulletin 4 spin-off, which required, among other things, that the recipient not be an affiliated company. Tiburon, however, was an affiliated company because it was owned by Metter. As such, the shares received by Tiburon should not have been unrestricted.

114. On August 25, 2009, Michael Metter sent an email[25] to Steven Moskowitz, writing:

> Steven
>
> I couldn't speak before since the room was full. i need about $1500 in cash for the weekend plus a wire for $36000 to Tiburon next week for September. This will bring the amount outstanding on the last batch to 100.0MM.

Business Talk Radio

115. Business Talk Radio received one million Spongetech shares in April 2008. Business Talk Radio is a publicly-held company located in Connecticut. Michael Metter is the President of Business Talk Radio and holds 8% of Business Talk Radio's shares. He also has signature authority on Business Talk Radio's bank accounts. In the summer of 2009, Spongetech

---

[25] This email was sent from greenwich4@aol.com.

transferred more than $5 million to Business Talk Radio, purportedly as a loan.

E.   Stock Transfers to Foreign Entities

116. RM Enterprises transferred about 588 million shares to entities and individuals located in foreign countries. Likewise, Asset Management, Wesley Equities, and AIT Capital transferred about 97 million shares to entities and individuals located in foreign countries.  Collectively, these four companies transferred 687 million shares of Spongetech to entities and individuals located in foreign countries: 210 million to five recipients in Lichtenstein, all of which shared the same address; 179 million to two recipients in Panama, which shared the same address; 120 million to six recipients in Switzerland, three of which shared the same address; 52 million to one recipient in the British Virgin Islands; 51 million to one recipient in Spain; 40 million to one recipient in Curacao; and 27 million shares to one recipient in Israel.

117. Frank Nicolois and Thomas Cavanagh frequently traveled to Europe, where they met with individuals and entities who purchased Spongetech shares.  These individuals and entities often benefitted from the unrestricting of shares by virtue of the forged, fraudulent, and suspicious opinion letters described in this Affidavit.

48

USE OF EMAIL ACCOUNTS DURING THE FRAUDULENT SCHEME

118. Emails identified and collected during the course of this investigation were sent or received by Metter, Cavanagh, Nicolois, Speranza, and "David Bomart" through the EMAIL ACCOUNTS.

A.   greenwich4@aol.com

119. Michael Metter testified before the SEC that greenwich4@aol.com was his primary email address.

120. Numerous emails sent to or from greenwich4@aol.com relate to Spongetech customers, press releases, SEC filings, the transfer or shares, and the transfer of money. The following examples are provided:

- On September 9, 2008, Metter sent an email from greenwich4@aol.com discussing forward looking statements in a 10-Q SEC filing.
- On April 14, 2009, Metter sent an email from greenwich4@aol.com asking Moskowitz to "[p]lease wire DL $6000 (as a loan) when you get a moment."
- On April 23, 2009, Metter sent an email from greenwich4@aol.com to Moskowitz and others approving a press release announcing a letter of intent for a $5 million accounts receivable credit line. Curiously, less than an hour earlier, Metter and Kolvezon, the COO, exchanged emails in

which they objected to the press release because
the line of credit was not executed.

- On August 27, 2009, Metter sent an email from
  greenwich4@aol.com to Moskowitz asking Moskowitz
  to "[p]lease do the wire for me so I can take care
  of September the amount $36000.  That would bring
  the number left from the raise to $100,000."

- On July 9, 2009, Metter sent an email from
  greenwich4@aol.com to Moskowitz asking Moskowitz
  to "[p]lease check on the wire to Tiburon when you
  get a chance."  Moskowitz replied that Metter
  should sell shares of Business Talk Radio (a
  company controlled by Metter) so that Spongetech
  could "stop the bleeding."  Metter, in turn,
  replied stating that the money "we" are lending is
  from "dollars I raised" and that "anyway this is
  through [T]iburon."

- On August 31, 2009, Metter sent an email from
  greenwich4@aol.com to Moskowitz commenting on a
  draft press release announcing August sales of $20
  million by writing, "Frankly these numbers sound
  absurd."  (The press release was issued the next
  day with those very numbers.)

B.   GeorgeSperanza@aim.com

121. Speranza testified before the SEC that GeorgeSperanza@aim.com was his primary email address.

122. A large number of emails sent to or from GeorgeSperanza@aim.com relate to Spongetech and some of these emails specifically reference (1) the virtual offices set up by Speranza for the fake customers; (2) the SEC investigations; (3) payments to Speranza; and (4) other matters pertinent to this investigation.  The following examples are provided:

- On August 25, 2009, Speranza sent an email from GeorgeSperanza@aim.com to Moskowitz asking for payment from a third party for featuring Spongetech for one year on stock promotion sites managed by Speranza.

- On September 23, 2009, DaVinci, one of the virtual office providers, sent order confirmations to GeorgeSperanza@aim.com for the virtual offices registered for SA Trading Company, US Asia Trading, Dubai Export Import Company, New Century Media, and Fesco Sales Corp.

- On September 28, 2009, Speranza sent numerous emails from GeorgeSperanza@aim.com to Michael Metter, specifically referencing the SEC in one, and writing in another, "I would like to know what

51

is going on.  Have I done anything wrong?  I don't get it?"

- Later the same day, Speranza sent emails from GeorgeSperanza@aim.com to Moskowitz with the addresses, phone number, and contact names for SA Trading and Fesco Sales.

- On October 6, 2009, Speranza sent an email from GeorgeSperanza@aim.com to Moskowitz including addresses and the phone numbers for SA Trading, United Asia, Dubai Export, Fesco Sales, and New Century.

C.   Cavanagh555@hotmail.com

123.  Your affiant has obtained records that reflect that the "user info" maintained by Microsoft for Cavanagh555@hotmail.com shows that the account was registered in October 2007 in the name of "Thomas Cavanagh" in New York.  The ZIP Code provided, 10017, is the same as the house in which Cavanagh resided.  Moreover, your affiant believes that the content and context of numerous emails sent to or from Cavanagh555@hotmail.com establish that Cavanagh was the person using the email account.

124. Numerous emails sent to or from Cavanagh555@hotmail.com relate to Spongetech, typically referring to the purchase of shares by foreign investors, the transfer of

money, and other matters pertinent to this investigation.  The
following examples are provided:

- On October 13, 2008, Moskowitz sent an email to
  Cavanagh555@hotmail.com attaching wire
  instructions for Asset Management, AIT Capital,
  and Wesley Equities.

- On November 24, 2008, Cavanagh sent an email from
  Cavanagh555@hotmail.com to Moskowitz listing stock
  purchases of 10.5 million Spongetech shares by
  foreign investors.

- On March 12, 2009, Cavanagh sent an email from
  Cavanagh555@hotmail.com to Moskowitz listing stock
  purchases of 33.5 million Spongetech shares by
  foreign investors.

- On April 13, 2009, Cavanagh555@hotmail.com was
  copied on an email from Moskowitz to a manager at
  the bank at which Cavanagh and Nicolois cashed
  hundreds of checks.  In the email, Moskowitz
  confirmed that he will give the bank manager six
  (apparently free) tickets to an unidentified
  sports event.

- On July 27, 2009, Cavanagh555@hotmail.com was
  copied on an email from a Swiss asset manager to
  Moskowitz with the following subject line: "FYI:

53

German Press 'Focus Money' is translating the

PR[26]-News of Spongetech...gr8 development for the

german market! Focus Money is well known in german

part of Europe!"

D.    afan307@hotmail.com

125. Your affiant has obtained records that reflect

that the "user info" maintained by Microsoft for

afan307@hotmail.com shows that the account was registered in June

2003 in the name of "Frank Nicolois" in New York.  The ZIP Code

provided, 10307, is the same as the house in which Nicolois

resided until recently.  Moreover, your affiant believes the

content and context of numerous emails sent to or from

afan307@hotmail.com establish that Nicolois was the person using

this email account.

126. A large number of emails sent to or from

afan307@hotmail.com relate to Spongetech, and typically refer to

the purchase of shares by foreign investors, the transfer of

money, and other matters pertinent to this investigation.  The

following examples are provided:

▫ On May 30, 2008, Nicolois received an email at

afan307@hotmail.com from a Swiss asset manager

attaching a payment confirmation for a $100,000

---

[26] Your affiant believes that "PR-News" refers to Spongetech
press releases.

wire transfer from a company in Belize to RM
Enterprises for Spongetech shares.  Nicolois then
forwarded this email to Moskowitz.

- On November 11, 2008, Nicolois sent an email from
afan307@hotmail.com to Moskowitz and attached a
document that listed stock purchases of more than
23 million shares by foreign investors and asked
that the stocks be sent to an address in
Switzerland.

- On April 13, 2009, afan307@hotmail.com was copied
on an email from Moskowitz to a manager at the
bank at which Cavanagh and Nicolois cashed
hundreds of checks.  In the email, Moskowitz
confirmed that he will give the bank manager six
(apparently free) tickets to an unidentified
sports event.

- On July 27, 2009, afan307@hotmail.com was copied
on an email from a Swiss asset manager to
Moskowitz with the following subject line: " FYI:
German Press 'Focus Money' is translating the PR-
News of Spongetech...gr8 development for the
german market! Focus Money is well known in german
part of Europe!"

E.   davidbomart.bcllc@gmail.com

127. Google records show that an email account for davidbomart.bcllc@gmail.com was registered on May 19, 2009, at 8:04 a.m.  The secondary email provided during the registration was Steven2010@yahoo.com.

128. The investigation has identified a small number of emails to and from Bomart that were sent and received in or about May 2009.  The following examples are provided:

- On May 19, 2009, 8:11 a.m. (seven minutes after the Bomart email account was created), an email was sent from davidbomart.bcllc@gmail.com to Moskowitz with "hello" as the subject line and "hi" as the content of the message.  This appears to have been a "test" email from Moskowitz using the Bomart email account to himself.

- On May 19, 2009, at 8:49 a.m. (45 minutes after the Bomart email account was created), the following email was sent from davidbomart.bcllc@gmail.com to Spongetech's transfer agent, Moskowitz, and others (errors in original):

    Subject: Legal opinion

    Mr. John Christopher Troster

    Let me introduce myself I'll be handling
    the legal opinion for Spongetech

56

Delivery System and R M Enterprises.
I'll be working with the spongetech
staff in the next few days to replace
all of Mr. Pensleys opinion's which
after review the company didn't forge
but seems to be a monetary dispute which
will be resolved in the months to come.
I have know Mr. Moskowitz and the
company a long time this not something
they would do. So we will be replacing
all of Mr. Pensleys opinion's who has
reneged on his deal with the company.
How should we proceed by fedex these
opinion's or e-mail them to you or both
for your files. Thank you in advance for
your cooperation in this matter.

Also Mr Moskowitz says your Transfer
agent is one of the best he has worked
with can I get cost information to
switch some of my public companies to
you. I look forward to working with you
and your staff in days to come.

David Bomart ESQ
Partner
Bomart,Cone & Rolland LLP Since 1972
davidbomart.bcllc

▪ On May 22, 2009, various emails were sent to and

from davidbomart.bcllc@gmail.com after the

attorney for Spongetech's transfer agent requested

that Bomart call him immediately.  Bomart's

replied that he was at dinner with his family in

Paris and would call back in an hour to set up a

meeting the following Tuesday.  (The meeting never

happened, according to the transfer agent's

attorney.)

▫ On May 26, 2009, Bomart sent an email from davidbomart.bcllc@gmail.com to the transfer agent's attorney and Moskowitz stating that he was flying to his LA office and providing a call in number for a 2:30 p.m. conference call. (The conference call never happened, according to the transfer agent's attorney.)

## CONCLUSION

129. Based on the facts described above, I respectfully submit that there is probable cause to believe that the EMAIL ACCOUNTS contain information concerning securities fraud, obstruction of justice, money laundering, and other crimes.

130. In addition, I believe that to determine the scope and nature of these fraudulent activities, it is necessary to seize all images and all text messages stored in the EMAIL ACCOUNTS for the following reasons. First, because voluminous amounts of information can be stored in a computer account, and because it might be stored in a deceptive fashion or with deceptive file names to conceal criminal activity, the searching authorities must carefully open and examine all the stored data to determine which of the various files are evidence, fruits, or instrumentalities of the crime. This sorting process can be extremely time consuming and would be impractical to do at the offices of EMAIL ACCOUNTS ISPs. Second, this sorting process

must be done in a controlled environment, due to the extensive array of computer hardware and software that might be necessary for computer experts to analyze the data and to recover potentially "hidden," erased, compressed, password-protected, or encrypted files, while at the same time ensuring the integrity of the data recovered and reducing the possibility of inadvertent modification of the data in question.

WHEREFORE, I respectfully request that search warrants issue, pursuant to Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. §§ 2703(a), authorizing FBI and IRS Special Agents and other law enforcement agents to search the contents of the EMAIL ACCOUNTS listed in Attachments A-1, A-2, and A-3, and therein to seize the items described in Attachments A-1, A-2, and A-3, respectively, all of which constitute

evidence, fruits, and instrumentalities of violations of Title

15, United States Code, Sections 78j(b) and 78ff; and Title 18,

United States Code, Sections 371, 1505, and 1956(h)).


Thomas McGuire
Special Agent
Federal Bureau of Investigation


Sworn to before me this
1st day of November, 2010


HON.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

ATTACHMENT A-1

List of Items to be Seized

All records and other stored information in the possession or control of AOL Inc., 22000 AOL Way, Dulles, VA 20166, in whatever form kept, relating to each of the accounts

greenwich4@aol.com
GeorgeSperanza@aim.com

for the period from January 1, 2007 through May 4, 2010, all of which constitute evidence, fruits or instrumentalities of violations of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 18, United States Code, Sections 371, 1505, and 1956(h), including, but not limited to:

1.      all subscriber information (including subscriber names, addresses, telephone numbers, dates of birth, social security numbers, account numbers, status of account, duration of account and method of payment);

2.      all email, including any attachments sent by or received by the accounts, whether saved or deleted, whether contained directly in the email account or in a customized "folder";

3.      all account history (including customer Terms of Service and any complaints);

4.      all detailed billing records (including date, time, duration, and screen name used each time a particular account was activated);

5.      a complete log file of all activity relating to the account (including dates, times, method of connection, Internet Provider connection log, port, dial-up and/or location); and

6.      all records of subscriber account preferences, including but not limited to, the name and Internet address of any "favorite places" or "book-marked" websites specified by the user(s) of the accounts, along with any "address books," "buddy lists," or "member profiles" maintained by, or related to, the account.

ATTACHMENT A-2

List of Items to be Seized

All records and other stored information (and any information preserved under MSN preservation record number GCC-114023-LH0D8B or otherwise) in the possession or control of Microsoft Corporation, One Microsoft Way, Redmond, WA 98052, in whatever form kept, relating to each of the accounts

Cavanagh555@hotmail.com
afan307@hotmail.com

for the period from January 1, 2007 through May 4, 2010, all of which constitute evidence, fruits or instrumentalities of violations of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 18, United States Code, Sections 371, 1505, and 1956(h), including, but not limited to:

1.     all subscriber information (including subscriber names, addresses, telephone numbers, dates of birth, social security numbers, account numbers, status of account, duration of account and method of payment);

2.     all email, including any attachments sent by or received by the accounts, whether saved or deleted, whether contained directly in the email account or in a customized "folder";

3.     all account history (including customer Terms of Service and any complaints);

4.     all detailed billing records (including date, time, duration, and screen name used each time a particular account was activated);

5.     a complete log file of all activity relating to the account (including dates, times, method of connection, Internet Provider connection log, port, dial-up and/or location); and

6.     all records of subscriber account preferences, including but not limited to, the name and Internet address of any "favorite places" or "book-marked" websites specified by the user(s) of the accounts, along with any "address books," "buddy lists," or "member profiles" maintained by, or related to, the account.

ATTACHMENT A-3

List of Items to be Seized

All records and other stored information in the possession or control of Google, 1600 Amphitheatre Parkway, Mountain View, CA 94043, in whatever form kept, relating to the account

**davidbomart.bcllc@gmail.com**

for the period from May 1, 2009 through May 4, 2010, all of which constitute evidence, fruits or instrumentalities of violations of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 18, United States Code, Sections 371, 1505, and 1956(h), including, but not limited to:

1.      all subscriber information (including subscriber names, addresses, telephone numbers, dates of birth, social security numbers, account numbers, status of account, duration of account and method of payment);

2.      all email, including any attachments sent by or received by the accounts, whether saved or deleted, whether contained directly in the email account or in a customized "folder";

3.      all account history (including customer Terms of Service and any complaints);

4.      all detailed billing records (including date, time, duration, and screen name used each time a particular account was activated);

5.      a complete log file of all activity relating to the account (including dates, times, method of connection, Internet Provider connection log, port, dial-up and/or location); and

6.      all records of subscriber account preferences, including but not limited to, the name and Internet address of any "favorite places" or "book-marked" websites specified by the user(s) of the accounts, along with any "address books," "buddy lists," or "member profiles" maintained by, or related to, the account.